[Cite as *State v. Williams*, 2025-Ohio-5828.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

| | |
|---|---|
| State of Ohio | Court of Appeals No. L-25-00027 |
| Appellee | |
| | Trial Court No. CR0202202883 |
| v. | |
| Brandon Williams | **DECISION AND JUDGMENT** |
| Appellant | Decided:  December 30, 2025 |

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Angelina M. Wagner, Assistant Prosecuting Attorney, for appellee

Dan Weiss, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1}  Appellant, Brandon Williams, appeals the January 13, 2025 judgment of the Lucas County Court of Common Pleas sentencing him to 24 months in prison following his assault conviction.  For the following reasons, we affirm.

## I. Background and Facts

{¶ 2}   On November 9, 2022, Williams was indicted on one count of assault in violation of R.C. 2903.13(A), (C)(1), and (C)(3), a third-degree felony.  He was not alerted to the charges until more than 19 months later when he was served with the warrant for his arrest on June 14, 2024, and arraigned on June 17, 2024.

{¶ 3}   Based on this delay, Williams filed a motion to dismiss.  In it, he argued that his constitutional speedy-trial right was violated by the 19-month delay between the State securing the indictment and serving him with the indictment.  He claimed that the delay was presumptively prejudicial, the State had no justifiable reason for the delay, he was unaware of the indictment until he was served, so he could not have asserted his speedy-trial right, and it was possible that his defense had been weakened because it had been two years since the incident.

{¶ 4}   In its response, the State argued that Williams did not assert his rights under R.C. 2941.401, the statute that provides people incarcerated in Ohio prisons the right to be brought to trial on new matters within 180 days after delivering a written notice requesting a final disposition to the prosecuting attorney and the court where the charges are pending, so the State's duty to bring him to trial was never triggered.  Therefore, Williams's speedy-trial right could not have been violated.  And, regardless of Williams's failure to give notice, the State requested that Williams be conveyed from prison for arraignment when it noticed that his case had not been docketed, which shows that the State took reasonable steps to bring Williams before the court.

2.

{¶ 5} In his reply, Williams argued that the State had a duty to exercise reasonable diligence in trying to serve him, which it failed to do for more than one year. Because the State failed in its duty, his speedy-trial right was violated.

{¶ 6} The trial court denied Williams's motion to dismiss. In its judgment entry, the court first noted that Williams was arguing that his constitutional—not statutory—speedy-trial right was violated. Then, after reviewing the totality of the circumstances, the court found that Williams's constitutional speedy-trial right was not violated by the State's delay. First, the court found that, although the 19-month delay between indictment and service was presumptively prejudicial, the delay did not infringe on Williams's liberty because he was already incarcerated on unrelated charges and the delay did not extend or modify his incarceration in any way. Second, the State's negligence caused the delay, which weighed in Williams's favor. Third, Williams was unaware of the charges for most of the delay, so his failure to assert his speedy-trial right during that time would not be held against him. Finally, given that the delay was presumptively prejudicial, but not exceedingly long, Williams was required to show that he suffered actual prejudice, which he did not do.

{¶ 7} Following the denial of his motion to dismiss, Williams's case was tried to a jury. The trial began on January 7, 2025, 26 months after Williams was indicted. The State presented the testimony of the victim, J.H.; corrections officers, Comesha Allen and Ashton Roberts; nurse, Amanda Hayes; and Ohio State Highway Patrol trooper, Jason Derthick. The following evidence was presented at trial.

3.

**{¶ 8}** J.H. testified that he was working as a corrections officer at Toledo Correctional Institution ("ToCI") on July 11, 2022, when he was assaulted by Williams. Several days earlier, Williams had approached J.H. to ask him to bring contraband into the prison for Williams. When J.H. declined, Williams continued to ask him, so J.H. wrote him a ticket for a disciplinary infraction. Williams had his disciplinary hearing on July 11. As a result of the hearing, Williams was being sent to restrictive housing, also known as "the hole." J.H. saw Williams as he came out of his disciplinary hearing and could tell that he was "frustrated" with the outcome. Before Williams went back to his housing unit, he looked at J.H. and said that J.H. "was a bitch in his book."

**{¶ 9}** When Williams got back to his unit, J.H. noticed that Williams did not "lock down," i.e., go into his cell. J.H. said, "I went in to ask him if he was locking down, in which he stated no, in which I asked him again if he was refusing to lock down or go into his cell, in which he stated yes." Allen was with J.H. when he went to talk to Williams.

**{¶ 10}** After Williams refused to enter his cell, he "became aggressive." He "balled up his fist and stood in . . . almost like a fighting stance showing pretty assaultive indicators stating that because [J.H.] acted so tough he wanted [J.H.] to lock him down." At that point, Allen stepped in, deescalated the situation, and got Williams to walk to his cell. When Williams reached his cell, "he turned around, began yelling and pushing through Officer Allen trying to get to [J.H.] closing the distance." In response, J.H. "did draw [his] OC spray, or pepper spray, and disbursed a short burst of the OC spray to the

4.

facial region of Mr. Williams." After J.H. sprayed Williams with the pepper spray, J.H. said,

> Mr. Williams delivered a closed fist strike to the right side of my eye right here. I did lose balance and started to fall to the ground. Mr. Williams then delivered another closed fist strike to the back of my head and the left side of my head. I tried to deliver a closed fist strike to the left side in order to gain control and to prevent him from further assaulting me. At that instance he did stomp my head onto the ground causing the right side of my head to bounce off the concrete.

The assault ended when officers who responded to J.H.'s body alarm restrained Williams and escorted him from the unit.

{¶ 11} J.H. described the assault as "extremely painful." As a result, he experienced a laceration to his orbital bone, swelling on his face, a black eye, a sprain or strain in one of his neck muscles, and a concussion. He missed 11 days of work because of the assault.

{¶ 12} The State played video from J.H.'s body camera for the jury. Due to the angle of the camera and Williams's proximity to it, it is difficult to see exactly what is happening. J.H. said that the assault happened during the first 12 seconds of the video and explained, "[y]ou saw me deliver the closed fist strike to the side of Mr. Williams, and then you also did see him stomp my head, which caused it to bounce off the concrete floor."

{¶ 13} On cross-examination, J.H. testified that Williams went back into his unit by himself after his disciplinary hearing; he watched Williams walk back into the unit from his desk. He did not recall how much time elapsed between watching Williams

5.

walk back to the unit and going to address him about not entering his cell. He did not remember Williams asking for a minute to get some air.

{¶ 14} J.H. explained that pepper spray causes "[r]elease of the sinuses, of the nose, burning sensation in the eyes, inability to see, difficulty breathing, physical, psychological [e]ffects." When J.H. sprayed the pepper spray, he was behind Allen. After he sprayed it, Williams "was pushing through Officer Allen to close the distance between him and [J.H.]."

{¶ 15} Allen testified that she was working at ToCI on July 11, 2022, when J.H. was assaulted. Although she did not remember specifics, Allen recalled that Williams and J.H. were having a disagreement about something. Williams was not cooperating with J.H. She intervened because she saw "the disagreement build, escalating into maybe something that was going to be worse." Williams was "angry" at the time. After she intervened, Williams "was doing what [she] asked him. He was following [her] directives."

{¶ 16} However, once they reached Williams's cell, the situation escalated into a fight. J.H. used his pepper spray on Williams, and Williams reacted by going toward J.H. and Allen, who was between him and J.H. Allen attempted to stop the assault by shielding J.H. from Williams. Williams was not listening to her directions at that point. The incident ended when other staff arrived.

{¶ 17} The State played video from Allen's body camera for the jury. In it, Allen appears to be physically preventing Williams from reaching someone behind her, but he eventually pushes past her.

6.

{¶ 18} On cross, Allen testified that she ordered Williams to "go back to his cell, told him to try to calm down[,]" and he was following those orders when J.H. sprayed the pepper spray. She remembered Williams saying that he would lock down for her but not for J.H., who got no respect. She did not remember Williams saying he needed to get some air. She again confirmed that Williams was following her directions at all times.

{¶ 19} On redirect, the State had Allen go through her body camera video, which did not have sound. She explained that Williams was listening to her but was arguing with J.H. He commented that the "only reason why I'm doing this is because Ms. Allen is here." That is, "[t]he only reason why he was going to lock down was because [she] was asking him to, because [she] was in the area . . . ." At the point when J.H. sprayed the pepper spray, Williams was moving toward J.H.

{¶ 20} Hayes, a nurse and healthcare administrator at ToCI, testified that she examined J.H. and Williams after the assault. According to her records for Williams, he reported "no injuries, just burning from the OC" spray. Hayes's examination found that Williams's sclera (the whites of his eyes) were red but he had no other visible injuries.

{¶ 21} According to Hayes's records for J.H., he reported that an "inmate was punching and stomping on his face[,]" causing pain in his right temple, head, and jaw. Hayes noted "red marks on both side of his head, swelling, bruising, small amount of bruising near his right temple on his eye, scrape on the right check [sic], swelling to the right jaw." Hayes sent him to the hospital for further evaluation.

{¶ 22} On cross, Hayes testified that Williams was decontaminated but she did not remember the specifics of that process.

7.

{¶ 23} Roberts was working near the office where Williams's disciplinary hearing was held on July 11, 2022. When Williams came out of the office, he seemed "kind of upset" and was talking under his breath. Williams walked back to his unit, and Roberts went back to his desk. Soon after, Roberts heard an emergency signal from the unit where J.H. was working. When he entered the unit, he heard a "lot of directives of stop, stop, stop on the top range. [He] responded and [he] seen incarcerated individual Williams was sort of like kneeling and/or on top of [J.H.] and Officer Allen. . . . [H]e was on the ground attempting to try to get himself up, but he had his fists balled up . . . ." J.H. was on the ground and Allen was over top of him, trying to shield his head. Williams was trying to hit J.H. without hitting Allen.

{¶ 24} When Roberts and other staff members arrived at Williams's cell, they gave him directions to stop, but he did not. He "was not compliant at all." Roberts and another officer ended up "taking him to the ground" and securing his legs and arms.

{¶ 25} After the incident, Roberts saw J.H., who looked like he was injured. Roberts saw a cut and bruising on J.H.'s face, he "seemed like he was out of it," and he was "kind of like stumbling when he got up."

{¶ 26} Finally, Derthick testified that he investigated this case. He was familiar with the prison's use-of-force policy and explained that pepper spray was at the low end of possible responses. That is, after giving a verbal warning, pepper spray was the least severe response to an inmate threat. A corrections officer was only required to give one verbal warning before using pepper spray.

8.

{¶ 27} The State played surveillance video from ToCI during Derthick's testimony. In the video, Williams is walking along the catwalk to get to his cell. Allen is behind him and J.H. is behind her. As they approach his cell, Williams turns toward Allen and J.H., but Allen pushes him toward his cell. Williams appears to enter his cell but then turns around, pushes past Allen, and jumps on J.H. The camera is too far away to see exactly what Williams does while he is attacking J.H.

{¶ 28} After investigating the incident, Derthick filed charges against Williams. Although he had filed charges against corrections officers in the past, he did not file any charges against J.H. in this case.

{¶ 29} On cross-examination, Derthick testified that the video showed that Williams stopped punching J.H. as the staff members approached and before they arrived at his cell.

{¶ 30} The State rested after Derthick's testimony.

{¶ 31} Following the State's case, Williams moved for acquittal under Crim.R. 29, which the trial court denied.

{¶ 32} The jury found Williams guilty. The trial court sentenced him to 24 months in prison to be served consecutively to a prison sentence that he was serving out of Hamilton County.

Williams now appeals, raising three assignments of error:

ASSIGNMENT OF ERROR NO.1

THE TRIAL COURT ERRED WHEN IT DID NOT DISMISS APPELLANT''S INDICTMENT FOR A VIOLATION OF HIS SPEEDY TRIAL RIGHTS

9.

ASSIGNMENT OF ERROR NO. 2

THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUPPORT FINDING APPELLANT GUILTY AND THEREFORE THE FINDING OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

ASSIGNMENT OF ERROR NO.3

THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO OVERCOME APPELLANT'S CLAIM OF SELF-DEFENSE AND THEREFORE THE JURY'S GUILTY FINDING OF APPELLANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## II. Law and Analysis

### A. Williams's speedy-trial rights were not violated.

{¶ 33} In his first assignment of error, Williams contends that his constitutional and statutory rights to a speedy trial were violated. Regarding his constitutional right, he argues that he was incarcerated at the time of the incident and his indictment, and the State knew that he was incarcerated, but it did not attempt to serve him with the indictment for 19 months. He claims that this delay was long enough to be presumptively prejudicial, the State had no justifiable reason for the delay, he did not assert his right to a speedy trial because he did not know about the indictment, and the lengthy delay was prejudicial. Regarding his statutory right, he argues that his speedy trial time should have started at the time of his indictment because the State did not exercise reasonable diligence in trying to serve the indictment.

{¶ 34} In its response, the State acknowledges that Williams was not arraigned until 19 months after his indictment. However, it argues that there was no bad faith (only some "'official negligence'") by the State, Williams did not assert his rights because he

10.

was unaware of the indictment, and, importantly, Williams could not show any actual prejudice. It contends that Williams cannot point to anything showing that witnesses were unavailable or had issues with their memories, any evidence was unavailable to him, he served any pretrial detention, his incarceration was prolonged, or he lost the possibility of serving his sentencing concurrently as a result of the delay.

### 1. Constitutional speedy-trial right

{¶ 35} Review of a speedy-trial claim involves a mixed question of law and fact. *State v. Long*, 2020-Ohio-5363, ¶ 15. Therefore, we defer to the trial court's factual findings if they are supported by competent, credible evidence, but we review the application of the law to those facts de novo. *Id.*

{¶ 36} The right to a speedy trial is guaranteed by the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 10, of the Ohio Constitution. *State v. Adams*, 43 Ohio St.3d 67, 68 (1989). To determine whether a defendant was deprived of his constitutional right to a speedy trial, we must balance four factors: "(1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of a speedy-trial right, and (4) the prejudice to the defendant." *State v. Adams*, 2015-Ohio-3954, ¶ 88, citing *State v. Selvage*, 80 Ohio St.3d 465, 467 (1997), and *Barker v. Wingo*, 407 U.S. 514, 530 (1972). But we must first make a threshold determination that the delay in bringing the defendant to trial was "presumptively prejudicial"; if it was not, we need not inquire into the other factors. *State v. Hull*, 2006-Ohio-4252, ¶ 23. The Ohio Supreme Court has recognized that a delay becomes presumptively prejudicial as it approaches one year. *Adams* at ¶ 90, citing *Doggett v. United States*, 505 U.S. 647, 652

11.

(1992), fn. 1. Regardless, whether the length of a delay is presumptively prejudicial is dependent upon the facts and circumstances of each case. *Hull* at ¶ 23, citing *Barker* at 530-531.

{¶ 37} Here, the delay between Williams's indictment and his trial was 26 months, well over the one-year limit that is presumptively prejudicial. Thus, we must analyze the four speedy-trial factors.

{¶ 38} First, as the trial court found, the length of the delay—26 months—weighs in Williams's favor. *See Long* at ¶ 19 (delay of well over one year weighed in defendant's favor).

{¶ 39} Second, the trial court found that the reason for the delay was the State's negligence and its failure to exercise even minimal diligence in attempting to locate and serve Williams. The State did not address this prong in its response to Williams's motion to dismiss and only notes in its brief that it did not act in bad faith, but "there was some 'official negligence' in that the state failed to realize the case was undocketed for longer than one year[.]" We agree with the trial court that this factor weighs in Williams's favor. *State v. Irish*, 2019-Ohio-2765, ¶ 33 (3d Dist.), citing *State v. Spencer*, 2017-Ohio-456, ¶ 34 (4th Dist.) (the State has a constitutional duty to exercise reasonable diligence to serve the indictment).

{¶ 40} Third, the trial court found that Williams asserted his speedy-trial right four months after being arraigned and did not assert it sooner because he was unaware of the charges. The time before Williams learned of the indictment cannot be held against him. *Irish* at ¶ 36. However, the delay of even a few months between learning of the

12.

indictment and moving to dismiss based on a speedy-trial violation can weigh against a defendant. *Id.* at ¶ 37, citing *State v. Keaton*, 2017-Ohio-7036, ¶ 14 (10th Dist.) (six-month delay); *State v. McCain*, 2016-Ohio-4992, ¶ 17 (9th Dist.) (three-month delay); and *State v. Walker*, 2007-Ohio-4666, ¶ 31 (10th Dist.) (two-month delay). We find that waiting four months to assert his speedy-trial right weighs against Williams.

{¶ 41} Finally, the trial court found the length of the delay was presumptively prejudicial, but not exceedingly long, so Williams was required to show actual prejudice for the prejudice factor to weigh in his favor. It determined that Williams was not able to show any actual prejudice because he had not suffered any pretrial detention; was unaware of the indictment, so he could not have suffered any anxiety about the indictment before he was able to assert his speedy-trial right; and did not provide any evidence that his defense was weakened or witnesses' memories had faded due to the passage of time. A court analyzing the prejudice factor must consider it in light of the interests that the speedy trial right was designed to protect: "'(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.'" *Long* at ¶ 22, quoting *Barker* at 532. Here, Williams was already serving a prison sentence, so he was not subject to any pretrial detention related to the indictment in this case. As the trial court found, Williams did not know about this case during the 19-month delay between his indictment and his arraignment, so his uncorroborated assertion that "he suffered from the anxiety and concern" related to the case holds little weight. And Williams failed to show that he was actually prejudiced by the delay. He does not allege that witnesses or evidence were

13.

unavailable for his trial or point to anything showing that the witnesses who testified were unable to recall the pertinent events. We find that the prejudice factor weighs against Williams.

{¶ 42} Taking these factors into consideration, on balance, we find that Williams's constitutional speedy-trial right was not violated.

## 2. Statutory speedy-trial right

{¶ 43} In addition to a constitutional speedy-trial right, an accused who is incarcerated has a statutory speedy-trial right. Under R.C. 2941.401,

> When a person has entered upon a term of imprisonment in a correctional institution of this state, and when during the continuance of the term of imprisonment there is pending in this state any untried indictment, information, or complaint against the prisoner, the prisoner shall be brought to trial within one hundred eighty days after the prisoner causes to be delivered to the prosecuting attorney and the appropriate court in which the matter is pending, written notice of the place of the prisoner's imprisonment and a request for a final disposition to be made of the matter, except that for good cause shown in open court, with the prisoner or the prisoner's counsel present, the court may grant any necessary or reasonable continuance.

The State is not required to exercise reasonable diligence in locating an incarcerated defendant to inform them about a pending criminal charge. *State v. Hairston*, 2004-Ohio-969, ¶ 20. The State's duty to bring the defendant to trial within 180 days is triggered only when the defendant sends the required notice to the court and the prosecutor. *Id.* at ¶ 21.

{¶ 44} Here, there is no evidence in the record that Williams ever sent the notice required by R.C. 2941.401 to the State and the trial court. Thus, the State's duty to bring him to trial within 180 days never arose. *Hairston* at ¶ 21. Because the State never had a

duty to bring Williams to trial within the statutory timeframe, his statutory speedy-trial right could not have been violated by the delay between his indictment and his trial.

{¶ 45} Williams's first assignment of error is not well-taken.

**B. Williams's conviction is supported by sufficient evidence and is not against the weight of the evidence.**

{¶ 46} In his second assignment of error, Williams argues that his conviction is not supported by sufficient evidence, so it is against the manifest weight of the evidence. He contends that J.H. and Allen presented contradictory testimony regarding his behavior at the time of the assault, which created reasonable doubt. The State responds that Williams mischaracterizes Allen's testimony and that Allen's body camera video corroborates J.H.'s version of events.

{¶ 47} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). We do not weigh the evidence or assess the credibility of the witnesses. *State v. Were*, 2008-Ohio-2762, ¶ 132. "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 48} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of

15.

the witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387. We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson*, 2012-Ohio-6068, ¶ 15 (6th Dist.), quoting *Thompkins* at 387. Reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 49} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the jury's credibility determinations, given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.).

{¶ 50} Williams was convicted of assault in violation of R.C. 2903.13(A) and (C)(3), which prohibits a defendant from knowingly causing physical harm to another when the offense occurs in a state correctional institution, the victim of the offense is an employee of the department of rehabilitation and correction, and the offense is committed by a person incarcerated in the state correctional institution. A person acts "knowingly" when, regardless of his purpose, he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B). "Physical harm" is "any

16.

injury, illness, or other physiological impairment, regardless of its gravity or duration."
R.C. 2901.01(A)(3).

{¶ 51} In this case, the evidence showed that Williams, who was incarcerated at ToCI, a state prison, punched and stomped on J.H., a ToCI employee, causing a laceration to his orbital bone, swelling on his face, a black eye, a sprain or strain in one of his neck muscles, and a concussion. There was also evidence that Williams avoided hitting Allen while trying to continue his attack on J.H. This is more than sufficient evidence that Williams knowingly caused physical harm to an employee of the department of rehabilitation and correction in a state correctional institution.

{¶ 52} Further, after reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that the evidence weighs heavily against a conviction. We cannot say that the jury lost its way or created a manifest miscarriage of justice by convicting Williams. Although Allen testified that Williams was following her orders, she also said that Williams was arguing with J.H., and her body camera video showed that she was trying to physically restrain Williams from going after J.H. This supports (rather than contradicts) J.H.'s testimony that Williams was not compliant with his directions. Accordingly, we find that Williams's conviction is not against the manifest weight of the evidence. His second assignment of error is not well-taken.

### C. The jury's self-defense finding was not against the weight of the evidence.

17.

{¶ 53} In his final assignment of error, Williams argues that his conviction is against the manifest weight of the evidence because the State failed to disprove any of the elements of his self-defense claim. He contends that he was not at fault in creating the situation giving rise to the confrontation with J.H., he had reasonable grounds to believe or an honest belief that he was in imminent danger of bodily harm, and he did not use more force than was reasonably necessary to defend himself. The State responds that Williams was at fault in creating the situation, so it disproved one of the elements of self-defense beyond a reasonable doubt.

{¶ 54} To support a claim of self-defense involving the use of non-deadly force, a defendant must show that (1) he was not at fault in creating the situation giving rise to the affray; (2) he had reasonable grounds to believe or an honest belief that he was in imminent danger of bodily harm, and (3) he did not use more force than was reasonably necessary to defend against the imminent danger of bodily harm. *State v. Greer*, 2023-Ohio-103, ¶ 33 (6th Dist.). Once the defendant presents a viable self-defense claim, the State must disprove one of the elements beyond a reasonable doubt to defeat the claim. *State v. Weemes*, 2025-Ohio-2319, ¶ 32 (6th Dist.).

{¶ 55} For purposes of a self-defense claim, the term "not at fault" is "'broader than [the defendant] simply not being the immediate aggressor.'" *Id.* at ¶ 34, quoting *State v. Himes*, 2023-Ohio-3561, ¶ 25 (12th Dist.). A person may not provoke an assault or voluntarily enter an encounter and then claim self-defense. *Id.*

{¶ 56} "When reviewing a manifest weight claim involving self-defense, the court reviews the entire record, considers the credibility of witnesses, and determines whether

18.

the trier of fact clearly lost its way and created a manifest miscarriage of justice with respect to its finding that the State disproved at least one of the self-defense elements beyond a reasonable doubt." *Id.* at ¶ 33.

{¶ 57} In this case, the jury did not lose its way or create a manifest miscarriage of justice by finding that the State disproved Williams's self-defense claim because the evidence supports a finding that Williams was at fault in creating the situation that gave rise to the affray. Williams was "frustrated" when he came out of the hearing on his disciplinary violation, told J.H. that J.H. "was a bitch in his book[,]" refused to go to his cell when J.H. told him to, and "became aggressive" by balling his fists and assuming a fighting stance. Although Allen was able to temporarily deescalate the situation, Williams continued to argue with J.H. and was trying to push past Allen to get to J.H. at the time that J.H. sprayed his pepper spray. Taken together, these facts show that Williams was at fault in creating the situation. Therefore, Williams's third assignment of error is not well-taken.

### III. Conclusion

{¶ 58} Based on the foregoing, the January 13, 2025 judgment of the Lucas County Court of Common Pleas is affirmed. Williams is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Christine E. Mayle
_____                    _____
                                                          JUDGE


Gene A. Zmuda
_____                    _____
                                                          JUDGE


Myron C. Duhart
_____                    _____
CONCUR.                                                   JUDGE


This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.